UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

CHRISTIAN LEE HANSON,

        Petitioner,                         Case No. 1:10-cv-971

v.                                         Honorable Robert J. Jonker

CAROL HOWES,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On June 14, 2007, Petitioner was convicted in the Kent County Circuit Court of arson of a dwelling house, MICH. COMP. LAWS § 750.72A, and arson of an insured property, MICH. COMP. LAWS § 750.75. The trial court sentenced Petitioner to respective prison terms of 5 to 20 years and 23 months to 10 years. Petitioner currently is on parole. In his *pro se* petition, Petitioner raises three grounds for relief, as follows:

    I.        THE CIRCUIT COURT ABUSED ITS DISCRETION WHEN ADMITTING EVIDENCE OF THE 2006 CAR SHOOTING BECAUSE IT WAS NOT RELEVANT TO A CONSCIOUSNESS OF GUILT NOR WAS IT RELEVANT TO REBUT AN ANTICIPATED DEFENSE THEORY.

    II.      THE TRIAL COURT'S ERRONEOUS OR OMITTED INSTRUCTIONS ON THE DEFENDANT NOT TESTIFYING, THE PROPER USE OF THE OTHER ACTS EVIDENCE, THE BURDEN OF PROOF AND THE DEFINITION OF REASONABLE DOUBT DENIED MR. HANSON A FAIR TRIAL.

    III.     THE PROSECUTOR COMMITTED REVERSIBLE ERROR BY REPEATEDLY CALLING ON MR. HANSON TO TESTIFY AND PRESENT PROOF DURING THE CLOSING ARGUMENT.

Respondent has filed an answer to the petition (docket #5) stating that the grounds should be denied

Upon review and applying the AEDPA standards, I recommend that the petition be denied.

**Procedural History**

A.       **Trial Court Proceedings**

The state prosecution arose from a fire at Petitioner's home in Kent County. The prosecutor's theory of the case was that Petitioner, a part-time Muskegon Heights Police Officer, was unable to sell his 100-year-old farmhouse, so he burned it down to collect the insurance proceeds. The prosecutor asserted that Petitioner also was motivated to burn down the house so he could win back his estranged girlfriend by purchasing a newer lake-front home. The defense did not contest that someone set Petitioner's house on fire, but maintained that it was not Petitioner. Petitioner was tried before a jury in a trial beginning June 4, 2007 and concluding on June 14, 2007.[1]

William Bokhout testified that he returned home from work at Grand Rapids Community College at about 6:00 p.m. on November 11, 2005. (Tr. II, 109-111.) When he got out of his car, he noticed some haze and what smelled like burning leaves, which would not have been out of the ordinary at that time of year in the area of his home on Grand River Drive. (Tr. II, 111.) Bokhout, who was a vocal instructor and opera singer, left his home at 6:30 p.m. for an opera rehearsal. (Tr. II, 112.) Bokhout noticed that it had gotten much smokier outside and appeared to be coming from the direction of a neighbor's house. (Tr. II, 113.) As Bokhout backed out of his

---

[1]The trial transcripts will be referred to as follows:
Trial Transcript Volume I, June 4, 2007 (docket #15) -        "Tr. I"
Trial Transcript Volume II, June 5, 2007 (docket #16) -       "Tr, II"
Trial Transcript Volume III, June 6, 2007 (docket #17) -      "Tr. III"
Trial Transcript Volume IV, June 7, 2007 (docket #18) -       "Tr. IV"
Trial Transcript Volume V, June 8, 2007 (docket #19) -        "Tr. V"
Trial Transcript Volume VI, June 11, 2007 (docket #20) -      "Tr. VI"
Trial Transcript Volume VII, June 13, 2007 (docket #21) -     "Tr. VII"
Trial Transcript Volume VIII, June 14, 2007 (docket #22) -    "Tr. VIII"

driveway, he observed that the neighbor's house was dark, so he pulled in the driveway and drove up to the house. (Tr. II, 113-14.) Bokhout looked in the window next to the fireplace and saw flames just below the window sill. (Tr. II, 114.) Bokhout called 911 and reported the fire. (*Id.*) Bokhout testified that there had been a lot of high-end residential development in the neighborhood in recent years. (Tr. II, 121-28.) Petitioner's home, which Bokhout described as a charming farmhouse, was well-maintained. (Tr. II, 130-32.)

Royce Rodgers testified that he was a Muskegon Heights Police Officer. (Tr. II, 140.) He began his employment with Muskegon Heights in June of 2005, which was about the same time that Petitioner had started working at the department. (Tr. II, 140.) While Rodgers was out on parole on the night of November 11, 2005, he received a phone call from his sergeant, who was trying to contact Petitioner because there had been a fire at his home. (Tr. II, 141-44.) Rodgers called Petitioner's cell phone and left a voice message that there had been a fire at his house and that he should contact the Muskegon or Kent County dispatch. (Tr. II, 144-46.)

Edward Braman, a firefighter with the Plainfield Township Police Department, testified that he responded to a fire at 4879 Grand River Drive on November 11, 2005. (Tr. II, 150.) The truck carrying Braman and firefighter Paula Reynolds arrived at 6:38 p.m. (Tr. II, 150.) Two volunteer firefighters already were on the scene and informed Braman that the fire was in the southeast corner of the residence. (Tr. II, 152.) After the second fire truck arrived, Braman and Reynolds forced open the front door and entered the house. (Tr. II, 155-56.) Braman could not hear any smoke detectors sounding inside the house. (Tr. II, 158.) Braman and Reynolds knocked down the flames within a few minutes in the living room area where they entered. (Tr. II, 158-60, 168.) They then opened a window for ventilation and began to conduct a preliminary search of the first

floor to make sure there was no one in the home.  (Tr. II, 159-61.)  As Braman went down a hallway, he encountered another fire in a storage or pantry area that required additional water to extinguish.  (Tr. II, 161-63. 168-69.)  After that, Braman briefly went up to the second floor and then had to leave the house because his air tank was running low.  (Tr. II, 163, 172-73.)  Braman did not observe any active fire on the second floor.  (Tr. II, 173.)  Braman reported to the commander that there were two separate fires because that can be indicative of an arson.  (Tr. II, 170.)  After the fire was suppressed, Braman went back inside the house to conduct a more thorough search of the second level.  (Tr. II, 165-66, 184.)  During that search, Braman observed a 20-ounce bottle, duct tape and what looked like a snuffed out fire.  (Tr. II, 185.)

Lieutenant Patrick Duvall of the Plainfield Township Fire Department testified that fire crews arrived on the scene at 6:38 p.m.  (Tr. II, 191.)  As the command officer, Duvall walked around the structure to evaluate the fire and then established a command post.  (Tr. II, 192-93.)  Duvall observed that all of the doors and windows were intact and fire was visible through a window on the "B" side of the house.  (Tr. II, 192-93.)  Duvall testified that the couch was the point of origin of the fire in the living room.  (Tr. III, 9-10.)  The closet was the point of origin for the second fire.  (Tr. III, 13.)  There was a 20 ounce bottle with duct tape around it in the closet that was heavily melted and smelled of gasoline.  (Tr. III, 14-15.)  According to Duvall, there had been a third fire on the second floor of the house, but it had snuffed itself out by the time the firefighters arrived on the scene.  (Tr. II, 197.)  The third fire originated at the top of the stairway, where they found another melted pop bottle that smelled of gasoline.  (Tr. III, 17-18.)  According to Duvall, there was no connection between the three fires.  (Tr. III, 14, 18.)  Because there were multiple fires, Duvall called a fire investigator to the scene.  (Tr. II, 196.)  Duvall testified that there were empty picture

hangers on the dining room wall, which also can be indicative of an arson. (Tr. III, 6-7, 12.) He further testified that two smoke detectors were found laying in the stairwell. One of the detectors was melted and the other appeared to be in good condition. (Tr. III, 7, 11-12.)

Duvall testified that Petitioner arrived on the scene at 10:30 or 11:00 p.m. (Tr. III, 4-5.) According to Duvall, Petitioner was very quiet and only asked if anyone was hurt. (Tr. III, 4.) Duvall testified that most people have a bigger reaction to a fire at their home and ask more questions about the fire. (*Id.*) Duvall was acquainted with Petitioner because Petitioner had worked for the Grand Rapids Township Fire Department. (Tr. III, 5.) Duvall requested that the Kent County Sheriff's Department conduct a criminal investigation of the fire. (Tr. III, 24.) Deputy Vitton from the Kent County Sheriff's Department responded to the scene and spoke with Petitioner. (*Id.*) The fire department cleared the scene just after midnight. (Tr. III, 20.) The scene was secured with crime scene tape, but some of the doors and windows no longer were intact. (*Id.*) The realty lock box on the front door appeared to be closed and intact. (Tr. III, 45-46.)

David Peterson, Chief of the Plainfield Fire Department, testified that Duvall was the Incident Commander for the fire, so Peterson focused on safety issues at the scene. (Tr. III, 61-62.) Peterson testified that 99% of the time that there are two unconnected fires, they are the result of arson. (Tr. III, 62.) From property found in the home, Peterson learned that the house belonged to Petitioner. Peterson knew Petitioner from the Grand Rapids Township Fire Department. (Tr. III, 64.) Petitioner also had applied for a position with the Plainfield Fire Department, but was not hired. (*Id.*) Because of those connections, Peterson wanted a fire investigator from outside the department. (Tr. III, 65.) Peterson tracked down Petitioner's cell phone number and left him a message at 8:13 p.m. regarding the fire at his house and asked Petitioner to get in touch with him. (Tr. III, 66-67.)

Petitioner returned the call a couple of hours later. Petitioner asked "how bad is it," but did not ask what caused the fire. (Tr. III, 68.) Peterson advised Petitioner to go to the scene and speak with the fire investigator. (*Id.*) Petitioner had taken a fire officer training class at Peterson's station.[2]

Sergeant Greg Stormzand testified that he was employed as a fire investigator by the Michigan State Police. (Tr. III, 79-81). Stormzand was called to investigate the house fire at issue in this case. (Tr. III, 83.) As the fire investigator, his job was to determine the origin of the fire and the cause, if possible. (Tr. III, 83.) As far as origin, Stormzand's findings were consistent with the testimony of the firefighters on the scene. Stormzand determined that there were three areas of origin: (1) the southeast corner of the living room near the sofa on the first floor, (2) the back hallway closet on the first floor, and (3) the hallway by the master bedroom on the second floor. (Tr. III, 86.) He found partially melted pop bottles containing gasoline in the second and third areas of origin. (Tr. III, 90-91.) In the case of a plastic bottle filled with gasoline, the fire would not go down into the bottle and explode; rather, the vapors would burn at the mouth of the container. (Tr. III, 92.) Stormzand opined that the duct tape around the bottles could have been used as an ignition device that would have a slow flame and allow someone to walk away without being injured. (Tr. III, 97.) The fire in the living room caused the most damage because the materials in the sofa fueled the fire. (Tr. III, 95.)

Stormzand testified that he found two battery-operated smoke detectors on the stairs leading to the second floor. (Tr. III, 98.) There was plastic on the wall in the stairwell, which could have been where one of the detectors had been mounted. (Tr. IV, 10.) Stormzand could not locate a mount for the second battery-powered detector. (*Id.*) He found a third detector in the hallway on

---

[2]The parties later stipulated that Petitioner had taken the Fire Officer One Exam on two occasions, but did not pass. (Tr. VII, 181.)

the second floor that was hardwired into the electrical system. (Tr. III, 98.) The firefighters at the scene reported that they did not hear any smoke detector sounding while they were in the house. (Tr. III, 99-100, 108-09.) There was no evidence that the fire was caused by an electrical malfunction. (Tr. III, 101-102.)

In the case of an incendiary, or intentionally set fire, part of Stormzand's responsibility was to find the person who set the fire, the motive for setting the fire and to identify other crimes committed in relation to the fire. (Tr. III, 107-08.) There are several categories of fire motive, including vandalism, excitement, profit, spite revenge, and to cover-up. (Tr. III, 110-11.) Stormzand believed that this fire was motivated by profit. (Tr. III, 113.) He reached that conclusion because the fire involved a lot of planning, it appeared that some personal items had been removed from the house, and the house was for sale at the time of the fire. (*Id*.) Stormzand noted that there were bare hooks and nails on the dining room walls. (Tr. III, 104-05.) In addition to the items that appeared to be missing from the dining room walls, a sheriff's deputy told Stormzand that Petitioner had moved some of his firearms to the garage. (Tr. III, 142-45.)

Stormzand collected several items to be tested for accelerants, including the two plastic bottles, a piece of fire debris from the closet on the first floor where one of the bottles was found, a portion of carpet padding from underneath the bottle found on the second floor, and a piece of fire debris from the floor near the sofa. (Tr. III, 115-16.) All of those items tested positive for gasoline. (Tr. III, 116-17.) There were no identifiable finger prints on the bottles. (Tr. IV, 10-11.) If the house had burned to the ground, it would have been difficult to determine the cause and origin. (Tr. III, 120.) Based upon his investigation, all of the doors and windows were closed until the fire department arrived. (Tr. III, 122-26.) However, it appeared from photographs taken at the scene

that the slider in the back hallway closest to the laundry may have been unlocked at the time of the fire. (Tr. III, 127, 131-35.) Kent County Sheriff's Department conducted further criminal investigation (Tr. IV, 23.)

Eva Cole testified that she was a friend of Petitioner's and met him at Kosciuszko's Hall at around 7:30 p.m. on the night of November 11, 2005. (Tr. IV, 27.) They had made plans to meet there earlier that evening. (Tr. IV, 29.) At that time, Cole was dating Ken Marlette, who was working as a bartender at Kosciuszko's. (Tr. IV, 30-31.) Cole had one or two drinks, but Petitioner was drinking soda. (Tr. IV, 31-32.) According to Cole, Petitioner had not had alcohol in a couple of weeks. Cole had been seeing him more frequently during that time because Petitioner and his girlfriend, Lelea, had broken up two or three weeks earlier. (Tr. IV, 32, 49.) Cole described Petitioner as "heart broken" over the break-up. (Tr. IV, 34.) Petitioner and his girlfriend had broken up before, but Cole told the defense investigator that this time was different because Lelea appeared to be in a more long-term relationship this time. (Tr. IV, 36.) While they were broken up, Petitioner gave Lelea $8,000 to pay some bills. (Tr. IV, 50.)

Cole testified that Petitioner went to the restroom several times over the course of the night. (Tr. IV, 38-39.) Cole got hungry, so she and Petitioner left the hall around 10:00 p.m. to go get pizza. Cole drove her car. (Tr. IV, 39-40.) When they got back to the hall, Petitioner told Cole that he was going to his truck to check on his cell phone, which was charging. (Tr. IV, 37-40.) A few minutes later, Petitioner called Cole and told her that he had a phone message from the chief that his house was on fire. (Tr. IV, 41.) Cole called Lelea from the hall and informed her about the fire. (Tr. IV, 42.) Cole met Lelea at the Plainfield Township Fire Department. Cole and Lelea gave

statements to Deputy Kelly Vinton. (Tr. IV, 44, 68-69.) Petitioner had nowhere else to go, so he went home with Lelea. (Tr IV, 45-46.)

Cole testified that Petitioner and Lelea got back together two or three weeks after the fire and got married a couple of months later in Las Vegas. (Tr. IV, 51-52.) Cole testified that Petitioner always had wanted to marry Lelea and that they wanted a house on the lake. (Tr. IV, 53-54.) One of the reasons Lelea broke up with Petitioner is because he was too controlling. (Tr. IV, 78-79.) Cole did not know that Lelea wanted Petitioner to get counseling for his controlling behavior or that he had an appointment with a therapist on the day of the fire. (Tr. IV, 79.) Cole described Petitioner as frugal and did not see any apparent signs that he was in financial distress. (Tr. IV, 73-74.) Petitioner was excited about selling his house and believed that all of the new construction in the area would increase the value of his house. (Tr. IV, 74.) Petitioner took a lot of pride in the house and had done a lot of the remodeling himself. (Tr. IV, 81.)

Anthony Beurkens, a Grand Rapids firefighter, testified that he received a phone call from Petitioner on November 11, 2005, asking if he wanted to meet at Kosciuszko Hall. (Tr. IV, 83.) Beurkens ended up going to another bar, so he never saw Petitioner that night. (Tr. IV, 83-84.)

Kenneth Marlette testified that he worked for Access Business Group, but also worked from time-to-time as a bartender at Kosciuszko Hall on a voluntary basis. (Tr. IV, 88-89, 96.) Marlette and Petitioner had been friends for several years. Marlette knew from Eva Cole that Petitioner was coming down to the hall on the evening of November 11. (Tr. IV, 89-90.) Marlette arrived for work at the hall around 5:30 or 6:00 p.m. and Petitioner arrived sometime later. (Tr. IV, 90.) Marlette could not specifically recall what Petitioner was drinking, but assumed that he had a cocktail. (Tr. IV, 91, 97.) Later that night Cole and Petitioner ordered some food from an outside

restaurant and then left to pick it up. (Tr. IV, 91.) Cole came back with the food, but Petitioner was not with her. (*Id.*) While Cole was eating, Petitioner called on Marlette's cell phone and asked to speak to Cole. (Tr. IV, 91-92.) Cole left shortly thereafter. Later that night, Cole called Marlette and told him that there had been a fire at Petitioner's house. (Tr. IV, 92.) Marlette testified that the hall was equipped with a video surveillance system with several interior and exterior cameras. (Tr. IV, 98-101.) The system was set on a 36-hour loop, so footage from the evening of November 11 would have been taped over after 36 hours. (*Id.*) Marlette testified that Petitioner and Lelea had broken up a few weeks before the fire. (Tr. IV, 93.) Petitioner was devastated by the breakup. (Tr. IV, 93-94.)

Tomas Nawrocki, a detective with the Kent County Sheriff's Department, was the on-call detective on the night of November 11, 2005. At about 11:00 p.m., Nawrocki was called to assist Deputy Vitton with investigating a possible arson. (Tr. IV, 110.) Nawrocki went to the Plainfied Fire Department and interviewed Petitioner. (Tr. IV, 111.) Nawrowcki wanted to get some basic information from Petitioner, including a time line and some financial information. (Tr. IV, 125.) Petitioner gave Nawrocki a chronology of his activities for the day, which included dropping off a mortgage payment and going to Sam's Club, Gander Mountain, Grand Rapids Pool and Spa and a Ford dealership. (Tr. IV, 113-14.) Petitioner told Nawrocki that he left home for Kosciuszko Hall at 5:30 or 6:00 p.m. (Tr. IV, 115.) Petitioner was meeting Cole at the hall at 7:00 or 7:30 p.m., but went early because he knew the bartender, Kenny Marlette. (Tr. IV, 116.) Petitioner stayed at the hall until he went to B.C. Pizza at 9:00 or 10:00 p.m. (Tr. IV, 115.) Petitioner indicated that when he got back to the hall, he learned about the fire from voice messages

on his cell phone.  (Tr. IV, 115-16.)  Petitioner told Nawrocki that he was broken up with his girlfriend of seven years and currently was living alone.  (Tr. IV, 116-17.)

During the interview with Nawrocki, Petitioner could not recall whether he had locked the door when he left the house.  (Tr. IV, 117.)  Petitioner told Nawrocki that he had an idea who might have set the fire, but he could not discuss it without talking to his lawyer because it concerned a lawsuit that Petitioner had filed against a former employer, the Lake Odessa Police Department.  (Tr. IV, 117, 133.)   Petitioner indicated that the parties had agreed to a settlement in the suit, but it was not final.  (Tr. IV, 126.)  Petitioner described the lawsuit as "nasty" and claimed that his tires had been slashed nine or ten times since the lawsuit was filed.  (Tr. IV, 118, 133.)  He allegedly reported the tire slashings a couple of times, but the incidents had occurred in other jurisdictions.  (Tr. IV, 118-19.)  Petitioner confirmed that he had taken some pictures off the wall. (Tr. IV, 121.)

Concerning his finances, Petitioner indicated that his mortgage balance was $117,000, and the house was worth $170,000.  (Tr. IV, 120.)  According to Petitioner, the house was underinsured for $140,000 to $150,000, so he would be taking a loss on the property.  (Tr. IV, 120.) The house had been for sale since August or September of that year.  (Tr. IV 128.)  Petitioner told Nawrocki that he wanted to move to a lake front property.  (Tr. IV, 128.)  Petitioner owned a motorcycle, a truck and a car without no attached debt.  (Tr. IV, 127.) Petitioner also reported that his credit cards were paid off.  (Tr. IV, 129.)  At the time of the fire, Petitioner was working 20 to 30 hours per week with the Muskegon Heights Police Department for $10.50/hour.  (Tr. IV, 123.) Nawrocki turned the case over to other detectives after that night, so he did not do any follow-up on his interview with Petitioner.  (Tr. IV, 120.)

Rob Maxwell, an adjuster for State Farm's Special Investigative Unit, testified that Petitioner's home was insured with State Farm. (Tr. IV, 136.) The original policy on the structure was for $144,000, but with adjustment for inflation, was $154,106 at the time of the fire. The policy provided additional coverage of $115,576 for personal property loss. (Tr. IV, 156.) Petitioner submitted a personal property claim of $32,483.54. (Tr. IV, 150, 158.) Petitioner received an advance of $1,000 on November 15, and additional funds to pay for temporary housing, rented furniture, etc. (Tr. IV, 140-41.) The claim was referred to Maxwell, who met Petitioner at the house on November 21. (Tr. IV, 128.) Petitioner did not tell Maxwell who set the fire, but shared his suspicion that it was some police officers from his previous job. (Tr. IV, 139.) After a walk-through of the house, Maxwell took a recorded statement from Petitioner at Maxwell's office. (Tr. IV, 141-42.) When Maxwell asked Petitioner about the missing pictures from the house, Petitioner stated that they were at Lelea's house. (Tr. IV, 143-44.) The pictures were photographs of Lelea and other people. (Tr. IV, 148, 154-55.) In February 2006, Maxwell also took statements from Petitioner's wife, Lelea Hanson, and Eva Cole. (Tr. IV, 147.) A month later, Petitioner and his wife submitted to examinations under oath. (Tr. IV, 145-46.) An attorney represented State Farm for purposes of those proceedings. (Tr. IV, 146-48.) Maxwell communicated with the police about the on-going criminal investigation. (Tr. IV, 175.)

Kevin Walters, a realtor with Greenridge Realty, testified that Petitioner contacted his office in June of 2005 because he wanted to see a property on Lake Bella Vista that was listed with Greenridge. (Tr. IV, 178-80.) Walters met Petitioner and his girlfriend at the house for a showing. (Tr. IV, 178-79.) Petitioner told Walters that they were getting married and were looking for something on a lake between $200,000 and $250,000. (Tr. IV, 179-80, 193.) Walters developed

a relationship with Petitioner and ultimately listed his house in July of 2005. (Tr. IV, 180.) The house was listed at $180,000, which was at the high end of the market analysis. (Tr. IV, 182, 197-98.) A few weeks after the listing, Walters held an open house that was attended by two families. (Tr. IV, 184.) Other than the open house, Walters did not receive any requests to show the house and had no record of any other realtor showing the home. (Tr. IV, 184-85.) Walters suggested a price reduction, which Petitioner took under advisement. (Tr. IV, 185-86.) It was Walter's understanding that Petitioner had to sell his existing home before he could purchase another house. (Tr. IV, 187.) Walters testified that Petitioner re-listed the fire-damaged house with him in February of 2007. (Tr. IV, 191.) At the time of trial, there was a sale pending on the property for $80,000. (Tr. IV, 192-93.)

Larry Korolewicz, an attorney with Foster, Swift, Collins and Smith, testified that he specialized in insurance work and frequently represented insurance companies in cases of insurance fraud, including arson. (Tr. V, 3-4.) Korolewicz represented State Farm in the investigation of Petitioner's claim and conducted an examination of Petitioner under oath on March 14, 2006. (Tr. V, 4.) An examination under oath is much like a deposition, which is recorded and transcribed by a court reporter. (Tr. V, 5.) Petitioner was informed that he could have a lawyer present, but he was not represented at the proceedings. (Tr. V, 52-53.) In preparation for the examination, Korolewicz reviewed the insurance documents, police reports and other investigative information obtained in the case about the fire and value of the property. (Tr. V, 5-6, 42-46.) Petitioner told Korolewicz that he purchased the house in 2001 for $120,000. (Tr. V, 9, 64.) Petitioner stated that he had maintained the house and made some improvements. (Tr. V, 18-21; 65-67.) At the time of the fire, the house was listed for $180,000 and the contract included a 7% real

estate commission.  (Tr. V, 9-10.)  Due to the lack of interest in the listing and other evidence that the list price was high, Korolewicz concluded that there was not a great deal of equity in the house.  (Tr. V, 10.)  At the time of the fire, Petitioner owed $118,000 on the mortgage.  (Tr. V, 9.)  In discussing the new homes and condos being built around his house and sold for $270,000 to $500,000, Petitioner stated that he knew he was buying the "ghetto house" because it was going to be the lowest value property in the area.  (Tr. V, 22, 67-68.)

During the examination under oath, Petitioner told Korolewicz that he was not in a relationship at the time of the fire, but had dated Lelea off-and-on for several years.  They had broken up six or seven weeks before the fire.  (Tr. V, 13.)  However, they reconciled and got married three weeks after the fire.  (*Id.*)  Korolewicz testified that personal relationships were important to the investigation and that he had worked on other cases where a person burned down a home in order to get the proceeds to win back the love of his life.  (Tr. V, 14.)  Petitioner stated that the fire was a catalyst for their reunion.  (Tr. V, 15-16.)  After they went home together on the night of the fire, Petitioner and Lelea discussed getting married.  She suggested that they go to Las Vegas that night to get married, but Petitioner told her that it would not look good to his insurance carrier for them to run off to Vegas on the night his house burned down.  (*Id.*)  They initially decided to get married locally and obtained an application for a marriage license within a week, but then decided to get married in Las Vegas after all.  They booked the trip to Las Vegas within ten days  after the fire and got married there the first week of December.  (Tr. V, 17.)

Korolewicz questioned Petitioner about his finances before and after the fire.  (Tr. V, 22.)  Petitioner had worked for numerous municipalities and county law enforcement agencies over the years.  (Tr. V, 37.)  At the time of the fire, Petitioner was earning $10.51 per hour as a

police officer for the City of Muskegon Heights. (Tr. V, 35.) Petitioner did not have any other sources of income, but had received a settlement in June 2005, from a lawsuit against the City of Lake Odessa. (Tr. V, 35, 37.) As part of the settlement, he also was receiving benefits for a period of two years following his termination from his law enforcement position. (Tr. V, 55-57.) After attorneys fees and costs, Petitioner received about $130,000. According to Petitioner's bank records, he had about $85,000 left in his bank accounts at the time of the fire. (Tr. V, 35-36, 61.) Petitioner purchased a 2004 Harley Davidson motorcycle for $18,000 shortly before the fire. (Tr. V, 23.) He also had given Lelea $8,000 while they were broken up. (Tr. V, 23-24, 36.) Petitioner, however, did not have debt on any of his vehicles, nor did he have any outstanding balances on his credit cards. (Tr. V, 62-63.) With regard to future purchases, Petitioner told Korolewicz that he intended to sell his house and purchase a house on a lake. The house he wanted to purchase on Arbol Street was $300,000. *(Id.)*

When asked about the items missing from the living room walls, Petitioner told Korolewicz that he had taken the framed photos off the wall and given them to Lelea. (Tr. V, 25.) Petitioner later produced the photos, which were of his family and friends. *(Id.)* He also produced a tri-fold series of "Glamour Shot" photos of Lelea, which he had removed from the master bedroom and given to Lelea, along with the other photos. (Tr. V, 25-26.) Later in the examination, Petitioner stated that it was possible that Lelea had removed the pictures from the walls and taken them back to her house during the time that they were broken up. (Tr. V, 27-28.) He had given other items to Lelea before the fire, including a stuffed polar bear, some coasters and a movie. (Tr. V, 26.) Petitioner told Korolewicz that he owned four firearms - two shotguns and two pistols. The

shotguns were in the garage at the time of the fire, one of the pistols was in his truck and the second pistol was in his other car, which was parked in the driveway. (Tr. V, 26-27, 70.)

Petitioner told Korolewicz that he ran several errands on the morning and early afternoon of Saturday, November 11. He got home in the early afternoon and stayed there until he went to meet Eva Cole. (Tr. V, 28-29.) Petitioner initiated the meeting with Cole the previous day, but spoke to her again on Saturday afternoon. (Tr. V, 29.) Petitioner indicated that he left the house right around 6:00 p.m. and arrived at the hall at 6:30 or 7:00 p.m. (Tr. V, 30.) According to Petitioner, it took him fifteen to thirty minutes to get from his house to the hall. (Tr. V, 38.) He remained at Kosciuszko Hall until around 9:00 p.m., when he and Cole went to pick-up some food that Cole had ordered from B.C. Pizza. (Tr. I, 31-32.) When they got back to the hall at around 9:30 or 9:45 p.m., Petitioner went to his truck to check his phone, which he had left plugged into the car charger because the battery was low. (Tr. I, 32.) There were two voice mail messages on Petitioner's phone about the fire. Petitioner told Korolewicz that was the first time he had checked his cell phone since arriving at the hall that night. (*Id*.) However, according to Petitioner's cell phone records, he had checked his voice mail two other times while he was at the hall. (Tr. V, 32-33.)

During the examination, Petitioner stated that there were four smoke detectors in the house. (Tr. V, 34.) Three were battery operated and one was hard-wired. One of the battery operated detectors was mounted at the bottom of the stairs, the second was mounted at the top of the stairs and the third was sitting on a rafter in the basement. The hard-wired detector was mounted on the ceiling at the top of the stairs. (Tr. V, 34.) Petitioner told Korolewicz that he took the battery out of one of the detectors two or three weeks before the fire because it was beeping and needed a

new battery. He did not think that he had replaced the battery, but he believed that the other detectors were in working order. (*Id.*) Korolewicz testified that State Farm ultimately denied Petitioner's claim. (Tr. V, 73.) After that occurred, Petitioner retained counsel and filed suit against State Farm. However, the case was dismissed without prejudice by the agreement of the parties pending the outcome of the criminal case against Petitioner. (*Id.*)

Detective E.J. Johnson of the Kent County Sheriff's Department assisted Detective Jack Smith in the investigation of this case. (Tr. V, 75.) Johnson and four other officers searched Petitioner's house on November 25. Petitioner consented to the search. (Tr. V, 76.) Johnson seized various items from the house and garage. From the garage, Johnson seized a 24-ounce Mountain Dew bottle, a roll of duct tape and a piece of duct tape. (Tr. V, 76-77.)[3] Johnson also seized the duct tape from the garage because the plastic bottles used in the fire were wrapped in duct tape. (Tr. V, 86.) Johnson observed two gas containers in the garage, but did not believe that they were involved in the fire because they had cobwebs on them. (Tr. V, 86-88.) He also found two shotguns in the garage. (Tr. V, 87, 89.)

From the residence, Johnson seized a 24-ounce Mountain Dew bottle, three nine-volt Energizer batteries, a pad of paper, two Zales receipts, a laptop computer, two smoke alarms, two clocks, a Circuit City receipt, a Circuit City set-up order, and a Radio Shack receipt from the 25th. (Tr. V, 77.) Johnson seized the Mountain Dew bottles because the fire was started with green pop bottles filled with gasoline. (Tr. V, 77-80.) Johnson found one of the nine-volt batteries on the living room or dining room floor and the other two in the trash under the kitchen sink. (Tr. V, 81-82.) Johnson collected the batteries because many smoke detectors take nine-volt batteries and he

---

[3]The parties later stipulated that the duct tape on the pop bottles seized from the house did not match the duct tape found in Petitioner's garage. (Tr. VII, 181.)

was aware of reports that the fire fighters did not hear any smoke detectors sounding when they entered the house. (Tr. V, 82.) Johnson seized one of the battery-powered smoke detectors from the livingroom area and the hard-wired smoke detector from the second floor. (Tr. V, 84.) The battery-operated detector did not have a battery in it. (Tr. V, 85.) Johnson could not seize the other battery-powered detector from the stairwell area because it was melted into the carpet. (Tr. V, 84-85.) It appeared from the hardware left on the walls that one of the battery-detectors had been mounted on the wall at the bottom of the stairs and the other was mounted on the wall at the top of the stairs. (Tr. V, 126-28.) Johnson collected the two clocks because they both had stopped at 6:30 p.m. and no longer were functioning. (Tr. V, 90-91.)

Johnson testified that he was involved in a second consent search on November 29. (Tr. V, 91.) During that search, they seized a kitchen stove, a calendar, a smoke alarm from the basement, a yellow note pad, and two notes. (Tr. V, 91-92.) The kitchen stove was taken because it had a clock. (Tr. V, 92.) Johnson found the smoke alarm sitting on a rafter in the basement. (Tr. V, 131.) He opened it and found that the nine-volt battery had been pulled away just far enough to render the detector inoperable. (Tr. V, 92-94, 132.) The yellow note pad was seized from the master bedroom. The top page had something written on it. A second piece of paper found in the master bedroom had "National Association of fire Investigators" written on it with a PO box and a phone number. (Tr. V, 94-95, 99-100.)

The searches that Detective Johnson participated in were conducted two weeks or more after the fire. (Tr. V, 104.) Johnson believed that the fire department had secured the scene. (Tr. V, 106-07.) Johnson acknowledged that the front door had been broken in by fire fighters and that the glass in one of the sliders by the washer and dryer was broken in. The front door was

secured when they arrived for the search, but Johnson could not recall how it was secured.  (Tr. V, 107.)  He also was uncertain whether the slider was boarded up.  (Tr. V, 108.)

Lieutenant Lynn Gill of the City of Muskegon Heights Police Department testified that Petitioner was a part-time officer with the department in the summer of 2006.  (Tr. V, 142.)  On July 14, 2006, Petitioner reported to Gill that someone had put a joker card on his windshield and shot the passenger side of his vehicle.  (Tr. V, 143.)  At the time Petitioner reported the incident, his car was parked on the street near the employee entrance to the police station.  Gill notified the detective unit and turned the matter over to them.  (*Id*.)

Detective Stephen Clark of the Muskegon Heights Police Department testified that he was assigned to investigate the shooting of Petitioner's car.  Clark recovered a bullet from the rear passenger door of Petitioner's car.  He sent the bullet, along with a shell casing and a playing card, to the Michigan State Police Crime Lab.  (Tr. V, 149.)

Detective Randy Keift of the Kent County Sheriff's Department testified that he and his partner were assigned to assist Detectives Smith and Johnson with the apprehension and arrest of Petitioner on September 1, 2006.  (Tr. V, 154-55.)  Because Petitioner was a police officer and would have firearms at his home, they initially planned to arrest him after he left his house.  (Tr. V, 156.)  After waiting for several hours for Petitioner to leave his house, the detectives proceeded to his house to make the arrest.  (Tr. V, 157.)  No one answered the door, but the detectives believed that someone was in the house.  (Tr. V, 157-58.)  The detectives began walking around the house, but did not see anyone inside.  (Tr. V, 158.)  As he continued to wait at the door, Detective Smith heard something in the woods next to the house.  (Tr. V, 159.)  Keift looked into the woods and saw what looked like a burlap archery target sitting about 15 or 20 yards away.  (Tr. V, 159-60.)  Keift

realized that the object was a person crouched on the ground and yelled at him to put up his hands. The person stood up and began walking away from Keift. (Tr. V, 160.) The woods were too thick for Keift to run through, so he ran up the driveway and around the corner and saw Petitioner coming out of the woods. Keift told him to get his hands in the air and the other detectives assisted in placing him in handcuffs. (*Id.*) Petitioner was not armed and claimed that he was hiding in the woods because people were looking into his house. Petitioner further stated that he was being extra careful because someone recently had shot his car. (Tr. V, 161.)

Keift also participated in a search of Petitioner's lake home on March 27, 2007. (Tr. V, 170.) The test results for the bullet fired into Petitioner's car indicated that the gun was a .38. (Tr. V, 172.) During one of his interviews, Petitioner mentioned that he had a Grendel .380, so they were looking for that gun to see if it was the weapon that fired the round into his car. (Tr. V, 172.) While Keift was searching the garage, Petitioner and his lawyer were standing outside. Petitioner occasionally looked through the window and came in once to assist Keift with the search of the side bags of his motorcycle so they did not get damaged. (Tr. V, 177.) After searching most of the garage, Keift noticed a five-gallon bucket that was filled with sand and had cigarette butts on top. (Tr. V, 175.) Keift reached down into the bucket and felt a hard object. He called other officers to come and videotape as he pulled the gun out of the bucket. (Tr. V, 176.) The gun was in the holster inside a plastic bag. (Tr. V, 178-80.)

Dan Jensen testified that he worked as a record custodian for Nextel Sprint. (Tr. VI, 4.) Jensen produced cell phone records for Petitioner's account for November 10-13, 2005. (Tr. VI, 9.) The records reflected several calls between Petitioner and Eva Cole on November 11. (Tr. VI, 12-14.) The records also showed calls from Petitioner to Mr. Beurkens at 6:52 p.m. for 52 seconds

and at 6:56 p.m. for seven seconds. (Tr. VI, 15.) On the night of November 11, Petitioner accessed his voice mail from his phone at 5:56 p.m., 8:20 p.m. and 9:52 p.m. (Tr. VI, 19-20.) Jensen identified an incoming call from Chief Peterson at 8:13 p.m. and a return call to Peterson at 10:35 p.m. (Tr. VI, 15-16.) Petitioner also had an incoming call from Royce Rodgers at 9:34 p.m. on November 11. (Tr. VI, 17.) The records do not show whether the calls were answered or went to voice mail. (Tr. VI, 17.) The records also confirm Petitioner's call to Kenny Marlette at 10:34 p.m. (Tr. VI, 17-18.)

David Uhrbrock testified that he was employed as a master electrician at the Kent County Sheriff's Department. (Tr. VI, 32.) Uhrbrock's regular job was to maintain all of the electrical equipment for the Kent County Sheriff's Department and jail, but Detective Smith asked him to assist with the investigation at Petitioner's home. (Tr. VI, 32.) On November 29, 2005, Uhrbrock went to Petitioner's house and was asked to trace the wire from the hard-wired smoke detector back to the breaker box. (Tr. VI, 34-36.) Uhrbrock confirmed that the wire went to the breaker in question. (Tr. VI, 36.) He could not recall whether the breaker was tripped, but would not have disputed Detective Smith's report that the circuit was tripped. (Tr. VI, 48-49.) Uhrbrock did not determine whether the circuit was dedicated to the smoke alarm or had other outlets or switches wired to it. (Tr. VI, 51-52.) The hard-wired smoke detector was located right above one of the fire origins. (Tr. VI, 51.) According to Uhrbrock, significant heat or fire could trip a breaker. (Tr. VI, 53.) Uhrbrock also tested three nine volt batteries, and found the voltage to be 8.97, 8.37 and 3.03, respectively. (Tr. VI, 40.) He tested the batteries in a newly purchased smoke detector and all of them worked. (Tr. VI, 41-46.)

Troy Ernst, a forensic scientist with the Michigan State Police Crime Lab in Grand Rapids, testified that he tested four green plastic bottles to determine whether the two partially melted bottles were the same type as the undamaged 24-ounce Diet Mountain Dew bottles seized from Petitioner's residence. (Tr. VI, 62-63.) With regard to the type of plastic and color, Ernst could not differentiate between the melted bottles and the undamaged bottles. However, Ernst did not believe that the lesser damaged bottle of the two damaged bottles was the same as the undamaged bottles because it did not share all of the same physical characteristics, e.g., it did not appear to have a twisted contour at the top. (Tr. VI, 65-67.) With regard to the more damaged bottle, Ernst was unable to fully assess the physical characteristics, and, thus, was unable to conclude anything more than that it could not be differentiated from the undamaged bottles. (Tr. VI, 67.) Ernst could not be certain that the damaged bottles were 24-ounce bottles. (Tr. VI, 68.) The parties stipulated that there were no identifiable latent finger prints on the bottles. (Tr. VI, 68.)

William Tipton testified that he was a radio frequency engineer for Sprint Nextel. (Tr. VI, 71.) Tipton analyzed the call detail from Petitioner's cell phone for November 11 and determined which cell phone towers were used for the calls. (Tr. VI, 71-109.) Petitioner's direct connect calls to Eva Cole at 4:48 p.m. and 5:51 p.m. hit off the tower closest to his residence. (Tr. VI, 90.) Petitioner's second call to Anothony Beurkins at 6:56 p.m. hit off the tower at Brigg's Park, which is located .26 miles west of I-131, near the intersection of Turner Avenue and Hillside Drive. (Tr. VI, 90-91.)

Jeffrey Crump, a firearm examiner for the Michigan State Police, testified that on August 1, 2006, he received a metal jacketed fired bullet and a fired cartridge case from Detective Clark of the City of Muskegon Heights Police Department. (Tr. VI, 112-13.) Because Crump did

not have a firearm, his job was to identify the caliber of the bullet and what potential firearms it could have been fired from. (Tr. VI, 113.) Crump concluded that the bullet was a .380 or nine millimeter caliber and exhibited six lands and grooves with a right-hand twist. (Tr. VI, 116.) Lands and grooved are the markings that are made on a bullet as it travels through the barrel of a gun. (Tr. VI, 115.) Crump listed the manufacturers of firearms from which the bullet could have been fired, including Grendel. (Tr. VI, 116.) On March 19, 2007, Detective Johnson of the Kent County Sheriff's Department re-submitted the bullet and shell casing, along with a .380 caliber Grendel semiautomatic pistol to determine whether the bullet was fired from that pistol. (Tr. VI, 119.) Crump concluded that the bullet was fired from the Grendel. (Tr. VI, 120.) The cartridge also could have been fired from the Grendel, but Crump could not make a conclusive determination because the casing does not have the individual characteristics to make a conclusive determination. (Tr. VI, 121.)

Detective Jack Smith of the Kent County Sheriff's Department testified that this case was assigned to him shortly after the fire. (Tr. VII, 4.) Smith obtained Petitioner's cell phone records and noticed the two voice mails that he had accessed, but not responded to, on the evening of November 11. (Tr. VII, 6-7.) While Petitioner's house was being searched on November 25, Smith interviewed Petitioner outside the residence. (Tr. VII, 8.) During the interview, Smith confirmed the route that Petitioner told Detective Nawrocki he had taken from his home to the hall without making any stops. Smith believed that information was important because it did not explain Petitioner's whereabouts at the time he made the calls to Tony Beurkins. (Tr. VII, 10.) The calls to Beurkins, which were made at 6:52 and 6:56 p.m. on November 11 were connected through the cell phone tower at Ballpark Drive and the tower at Ann and 131. (Tr. VII, 13.) The route given

by Petitioner was consistent with the maps provided by Nextel.  (Tr. VII, 12.) Petitioner indicated that he might have taken a slightly different route during his examination under oath, but that did not make a material difference in terms of the cell phone tracking.  (Tr. VII, 13.)

Smith testified that the information provided by Petitioner concerning the calls he made on November 11 were consistent with the phone records, with the exception of the two voice mail messages he accessed at 8:20 p.m. and 9:52 p.m., which were not disclosed by Petitioner.  (Tr. VII, 16.)  Chief Peterson testified that he called Petitioner at 8:13 p.m. and left a message that his house was on fire.  Petitioner's voice mail was accessed approximately seven minutes later for about the same duration as the message left by Peterson.  Royce Rodgers testified that he called Petitioner at 9:34 p.m. and left a message that there was a fire at his house.  About 18 minutes later, Petitioner's voice mail was accessed again for about the same duration as the message left by Rodgers.  (*Id*.)  Petitioner told Smith that he only accessed his voice mail once at about 10:00 p.m. (Tr. VII, 17.)  During the interview, Petitioner told Smith that there were people out to get him, but he would not provide any specific information and said that he had to talk to his lawyer.  (Tr. VII, 18-19.)

Based upon reports that the smoke detectors were not working at the time of the fire, the detectives investigated the detectors during the November 25 search.  Because one of the detectors was hard-wired, Smith went down to examine the breaker box and found that one of the breakers had been tripped or turned off.  (Tr. VII, 21-26.)  Four days later, David Uhrbrock came to the scene and confirmed that the detector was wired to the breaker that was in the off position. (Tr. VII, 22.)  Smith did not observe any damage to the wiring from the fire.  (Tr. VII, 24.)  There was no labeling on the breaker box identifying the circuit for the smoke detector, which Smith

believed would have made it difficult for a stranger to the house to identify.  (Tr. VII, 29.)  Smith

further opined that the fires were strategically set around the house.  (Tr. VII, 30.)  For example, one

of the fires was set in the closet that had been converted by Petitioner from an elevator shaft.  (Tr.

VII, 30-31.)  Smith observed that Petitioner had a lot of nice things in his garage, including guns,

bow-hunting equipment, hunting clothing, etc.  (Tr. VII, 31-32.)  He acknowledged, however, that

the fire was just before rifle season for deer hunting.  (Tr. VII, 96.)  Smith obtained the code for the

lock box that remained on the front door of the house.  During the search on November 29, Smith

opened the lock box and found that there was not a key inside.  (Tr. VII, 35.)

        Between Smith's interview with Petitioner in November 2005 and their next meeting

in May 2006, Petitioner did not contact Smith to check the status of the investigation or to see if they

had found a suspect.  (Tr. VII, 37-38.)  Petitioner did not want to go to the police station for the May

2006 interview, but agreed to meet at his attorney's office.[4]  (Tr. VII, 38-39.)  When Smith asked

to go over his route from his house to the hall again, he became defensive and said that he provided

that information and was not going to talk about that again.  (Tr. VII, 39, 107-111.)  When

confronted with the two voice mails that he accessed on the night of the fire, Petitioner did not have

an explanation.  (Tr. VII, 39.)  Smith explained to Petitioner the evidence against him and told him

that it was being forwarded to the prosecutor's office.  (Tr. VII, 40.)[5]  The investigation was delayed

for a few months while they were conducting a forensic examination of the laptop computer seized

from Petitioner's residence.  (Tr. VII, 41.)  Nothing of evidentiary value was found on the laptop.

---

[4]At that time, Petitioner had not yet retained his trial counsel.  They met at the office of Jeannie Eardley, who had represented him in the suit against the City of Lake Odessa. (Tr. VII, 38, 184.)

[5]A recording of the May 2006 interview was played for the jury.  (Tr. VII, 112-13.)

(Tr. VII, 52.)  Petitioner ultimately was charged and arrested on September 1, 2006.  (Tr. VII, 43.)

Before Petitioner's arrest, Smith heard that Petitioner's car was shot in Muskegon Heights and that the bullet recovered from the car was a .380.  (Tr. VII, 41-42.)  Smith remembered that Petitioner had a Grendel .380 and proceeded to investigate whether Petitioner had shot his own car.  (Tr. VII, 42.)  The search warrant for the gun was not issued until March 2007, while Petitioner was out on bond for the arson charge.  (Tr. VII, 44.)  Petitioner and counsel were present during the search and stayed nearby while Smith was searching the garage.  (Tr. VII, 47-49.)  When Smith asked Petitioner the whereabouts of his Grendel .380, Petitioner responded, "I don't know."  (Tr. VII, 47, 128.)  Petitioner was not present when Detective Keift found the gun in the garage in a bucket of sand a short time later.  (Tr. VII, 47.)  Smith did not see Petitioner again after they found the gun.  (Tr. VII, 49.)  In addition to Smith's recollection of Petitioner telling him that he owned a Grendel .380, Petitioner stated during the examination under oath with Mr. Korolewicz that he owned a Grendel .380.  (Tr. VII, 50.)  The parties stipulated that an ATF trace of the serial number on the gun confirmed that Petitioner had purchased the weapon.  (Tr. VII, 51.)  Detective Smith's account of Petitioner's arrest was consistent with Detective Keift's testimony.  (Tr. VII, 52-59.)

During the March 2007 search of Petitioner's lake home, the detectives observed the framed photographs that had been removed from the Grand River house before the fire.  (Tr. VII, 69.)  The photographs included photos of Petitioner, Lelea, and their families.  (Tr. VII, 101-105, 132-33.)

Smith testified that, over the course of the investigation, Petitioner implicated several people with vendettas against him who could have set the fire.  Two of those people, John Shaw and

Bay Hudson, were Lake Odessa police officers involved in the lawsuit that Plaintiff filed against the City of Lake Odessa. (Tr. VII, 60-61.) Smith talked to those officers and did not find anything linking them to the fire. (Tr. VII, 62; 115-16.) Smith obtained the officers' time slips and surveillance videos to confirm that they were elsewhere at the time of the fire. (Tr. VII, 62-63.) Another person mentioned by Petitioner was Brian Nelson, who previously worked for the Lake Odessa Police Department, but had been employed by the Kent County Sheriff's Department for several years. (Tr. VII, 64.) Smith spoke with Nelson and did not find any evidence connecting him to the fire. (Tr. VII, 64; 118.) Petitioner mentioned Terry Johnson for the first time during the May 2006 interview, but Smith did not interview or investigate him. (Tr. VII, 117-18, 135-37.) During the interview on November 25, 2005, Petitioner also told Smith that he had been the victim of 8 to 10 ten tire slashings while he was working in Lake Odessa. (Tr. VII, 65.) Smith called all of the law enforcement agencies that had jurisdiction over that area and did not turn up any reports of tire slashings involving Petitioner's vehicle. (Tr. VII, 65-67.)

Paul Joseph of the Bureau of Alcohol, Tobacco and Firearms testified as an expert in the area of forensic auditing and accounting. (Tr. VII, 144.) Detective Smith asked Joseph to conduct a financial analysis on the financial gain that Petitioner would have had under the insurance policy on his home. (Tr. VII, 145.) Joseph found that if there had not been a fire and Petitioner had sold his house for the list price, he would have had a net gain of $48,193. (Tr. VII, 149.) Three different financial scenarios were created by the fire. Under the first scenario, Petitioner would receive a cash settlement from the insurance company for a total of $121,374 for the house and contents. After he paid the mortgage, Petitioner would have net cash of $4,467 from the policy. (Tr. VII, 150-51.) In that case, Petitioner also retains ownership of property, for which he received a

firm offer of $81,000. After fees and costs, Petitioner would net $77, 479.26 on the sale of the partially burned house and land. (Tr. VII, 150-53). Under the second scenario, Petitioner would not get any cash, but the insurance company would pay to completely repair the house and replace the contents. (Tr. VII, 154.) Under the third scenario, which requires the house to be a complete loss, Petitioner would get $154,000 for the construction of a new house at any location, plus $32,484 for replacement of his personal property. (Tr. VII, 155.) However, under the third option, the check for the construction of the new home would go directly to the builder and Petitioner would remain liable for the mortgage on the burned home. Consequently, the only scenario where Petitioner could walk away with cash was the first option, which was considerably more than if Petitioner had sold the house for the list price. (*Id.*)

With regard to Petitioner's bank accounts before the fire, Joseph noted that Petitioner's account balance went down $48,000 from $77,334 to $34,140, in the four-month period preceding the fire. (Tr. VII, 158.) In the year preceding the fire, his account balance was down about $87,000. (Tr. VII, 158.) According to Petitioner's tax returns, he earned $38,660 in 2003 and $43,585 in 2005. (Tr. VII, 159.) In 2005, Petitioner and his wife reported a total adjusted gross income of $97,623. According to the W-2 forms submitted with the return, Petitioner had earnings in 2005 of $30,232 and his wife earned $22,560. Johnson did not know the source of the remaining income for 2005. (Tr. VII, 160-61.) Johnson opined that Petitioner was over-insured for personal property because his coverage was $115,579, but he claimed only $32,484. (Tr. VII, 161.)

Detective Bryan Muir of the Kent County Sheriff's Department testified that Petitioner's case originally was assigned to him, but was re-assigned because Muir and Petitioner had a common friend and Muir was uncomfortable with being the lead investigator on the case. (Tr.

VII, 186.)  Muir did some initial work on the case before it was reassigned.  (Tr. VII, 188.)  He called some of the stores that Petitioner reportedly had visited on the day of the fire to see if they had surveillance video, but did not call anyone associated with Kosciuszko Hall to determine whether they had surveillance video from the night of the fire.  (Tr. VII, 188-89.)

Ryan Cox, a private fire investigator retained by the defense, testified that he examined the fire scene sometime after he was hired in October 2006.  (Tr. VII, 190-91.)  While at the residence, Cox recovered the remains of a nine volt battery from the area near the stair well in the living room.  (Tr. VII, 191-92.)  Cox's firm was paid $2,000 to $3,500 for services rendered in the case.  (Tr. VII, 196-97.)  Cox did not generate a written report of his examination as none was requested.  (Tr. VII, 198-99.)  Cox admitted that a comparison of the photographs taken by the fire examiner of the area where the battery was found just after the fire and Cox's photographs taken nearly a year later showed some changes in the debris.  (Tr. VII, 199-202.)  Cox could not make any representation about where the battery was during the initial fire investigation, if it was there at all, or where the battery had been used.  (Tr. VII, 206-07.)

Deputy Kelly Vitton of the Kent County Sheriff's Department testified that she responded to the scene of the fire.  (Tr. VII, 208.)  Vitton spoke with Petitioner and got some background information.  She could not recall anything about Petitioner wanting to remove a shotgun from the house.  Petitioner's demeanor was relatively calm.  (Tr. VII, 210.)  Vitton testified that she and another deputy secured the scene with police tape, but she could not specifically recall what, if anything more, they did to secure the exterior doors.  (Tr. VII, 211-12.)

Lelea Hanson, Petitioner's wife, admitted that she had stated in advance of trial and at the beginning of trial that she was going to exercise her marital privilege not to testify.  (Tr. VIII,

12-13.)  As a result, she was not sequestered with the other witnesses and sat in the courtroom throughout the trial.  (Tr. VIII, 12.)[6]  Lelea gave a statement under oath to State Farm.  She also was interviewed by detectives from the Kent County Sheriff's Department following Petitioner's arrest in September 2006.  (Tr. VIII, 11.)  Lelea testified that she found out about the fire at Petitioner's home from her friend, Eva Cole.  (Tr. VIII, 6.)  At that time, Lelea and Petitioner were not yet married.  Lelea testified at trial that they had broken up, but were discussing reconciliation.  (Tr. VIII, 6-7, 47-48.)  On cross-examination, Lelea admitted to stating, "No.  We were like completely off," when she was asked during her examination under oath whether she and Petitioner were communicating at the time of the fire.  (Tr. VIII, 14-17.)  Lelea admitted to telling the insurance adjustor that she had stopped wearing her ring for the last three months of the relationship.  At trial, Lelea claimed that she had had the ring for four years and continued to wear it on a chain around her neck.  (Tr. VIII, 19-21.)  Lelea had gone on dates with two other men while she and Petitioner were broken up.  (Tr. VIII, 22-23.)  She described Petitioner as controlling and admitted that he had followed her on at least one occasion and seen her with another man.  (Tr. VIII, 25-27.)  Lelea believed that Petitioner ran her date's license plate though the police LEIN system.  (Tr. VIII, 25-26.)  While they were broken up, Petitioner loaned Lelea $8,000 to pay some bills.  (Tr. VIII, 34-35.)

After she learned about the fire, Lelea went to the fire department and was interviewed by Deputy Vitton.  (Tr. VIII, 6-7.)  After the interviews, Vitton, Petitioner and Lelea went back to the house to retrieve a gun and barrel from the house.  Petitioner put the items in the garage because it was the only secure place after the fire.  (Tr. VIII, 7.)  Lelea testified that she helped Petitioner with decorating the house and made some photograph collages that were hung in

---

[6]In proceedings that were held outside the presence of the jury, the trial court ruled that Mrs. Hanson could testify only with regard to limited subjects that were identified by defense counsel.  (Tr. VII, 216-44.)

the sunroom and dining room. (Tr. VIII, 8.) Petitioner gave her four of the collages a couple of weeks before the fire. (Tr. VIII, 9, 29.) He dropped them off at her house. (Tr. VIII, 29-30.) Lelea also helped to select the furniture for the house. The same furniture was in the house at the time of the fire. (Tr. VIII, 10.) Lelea and Petitioner went back to the house a few times after the fire. (Tr. VIII, 31-32.)

On the day Petitioner was arrested, he called Lelea and told her that someone was at the house and not to come home until he called. She denied that Petitioner told her that Jack Smith was there. (Tr. VIII, 36-37.) Lelea testified that she was afraid because they had experienced tire slashes and rocks through their windshields, although none of those incidents were reported to the police. (Tr. VIII, 38-40.) Lelea did not recall telling Mr. Maxwell and Mr. Korolewicz that Petitioner got everything he wanted as a result of the fire. (Tr. VIII, 44.) She admitted that Petitioner went home with her the night of the fire. The fire made her realize that she did not want to live without Petitioner, so she suggested that they fly to Vegas and get married. (Tr. VIII, 44, 48-49.) Lelea admitted that Petitioner responded they better not get married right away because it might look suspicious to the insurance company. (Tr. VIII, 44.) They were married three weeks later in Las Vegas and eventually purchased a lake home for $238,000 on land contract. (Tr. VIII, 45, 52-53.) At the conclusion of trial, on June 14, 2007, the jury found Petitioner guilty of arson of a dwelling house and arson of an insured property. (Tr. VIII, 181-82.) On July 23, 2007, the trial court sentenced Petitioner to imprisonment of five to twenty years for the arson of a dwelling house conviction. (Sentencing Transcript (S. Tr.), 8, docket #23.) The trial court vacated the conviction for arson of an insured property on double jeopardy grounds. (S. Tr., 7.) However, at a resentencing hearing held on August 7, 2007, the trial court reinstated the conviction for arson of insured property

- 31 -

and sentenced Petitioner to a concurrent prison term of twenty-three months to ten years. (Resentencing Transcript, 8, docket #24.)

**B.    Direct Appeal**

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on March 11, 2008, raised the same issues as raised in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #26.)  By unpublished opinion issued on February 17, 2009, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 2/17/09 Mich. Ct. App. Opinion (MCOA Op.), docket #25.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same three claims raised before and rejected by the Michigan Court of Appeals.  By order entered August 6, 2009, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Order, docket #26.)

<u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United

States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at

411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

**Discussion**

I.     **Admission of Other Acts Evidence**

    In his first ground for habeas corpus relief, Petitioner claims that the trial court abused its discretion by allowing evidence that Petitioner shot his car. Petitioner contends that the evidence was not relevant to consciousness of guilt, nor was it properly admitted to rebut an anticipated defense theory.

    The Michigan Court of Appeals throughly reviewed the trial court's admission of the evidence under an abuse of discretion standard and concluded that the evidence was properly admitted to prove Petitioner's consciousness of guilt. The court stated:

> Defendant first argues that the trial court abused its discretion by admitting other-acts evidence that was irrelevant and prejudicial. A trial court's admission of other-acts evidence is reviewed for an abuse of discretion. *People v McGhee*, 268 Mich App 600, 609; 709 NW2d 595 (2005). In this case, the trial court admitted evidence that defendant shot his own car after the arson fire that burned his dwelling, attempting, unsuccessfully, to make it appear that someone was out to get him. In earlier statements to police, defendant had asserted that he was involved in a lawsuit against a former employer and that the arson may be related to the suit. Defendant further indicated to police that the tires of his vehicle had been slashed on nine to ten occasions, which was also possibly related to the lawsuit. The evidence concerning defendant's shooting of his own car was admitted by the trial court on a couple of theories, only one of which we need address. The trial court concluded, in part, that the other-acts evidence could be admitted to prove defendant's consciousness of guilt, similar to permissible evidence of flight. We agree.

> MRE 404(b) provides:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes,

wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

In *People v VanderVliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994), the Court clarified the test to be utilized to determine the admissibility of other-acts evidence:

> First, that the evidence be offered for a proper purpose under Rule 404(b); second, that it be relevant under Rule 402 as enforced through Rule 104(b); third, that the probative value of the evidence is not substantially outweighed by unfair prejudice; fourth, that the trial court may, upon request, provide a limiting instruction to the jury.

The list of proper purposes under MRE 404(b) is nonexhaustive. *People v Sabin* (*After Remand*), 463 Mich 43, 56; 614 NW2d 888 (2000). It is insufficient for the prosecution to merely recite a purpose for admission of the evidence. *People v Crawford*, 458 Mich 376, 386; 582 NW2d 785 (1998). The prosecution must also demonstrate that the evidence is relevant. *Id.* The offered evidence must not only be related to a fact that is of consequence, but it also "truly must be probative of something other than the defendant's propensity to commit the crime." *Id.* at 390. "If the prosecutor fails to weave a logical thread linking the prior act to the ultimate inference, the evidence must be excluded." *Id.*

We conclude that the evidence was offered for a proper purpose and logically relevant to show defendant's state of mind – consciousness of guilt – and was not introduced to show propensity. Evidence of (1) flight, *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995), (2) exculpatory statements later proven to be false, *People v Arnold*, 43 Mich 303, 305-306; 5 NW 385 (1880), (3) a defendant's efforts to influence or coerce the witnesses against him, *People v Mock*, 108 Mich App 384, 389; 310 NW2d 390 (1981), and (4) attempting to procure false witnesses, *People v Ranes*, 58 Mich App 268, 272; 227 NW2d 312 (1975), have all been admitted as relevant and probative evidence on a consciousness of guilt theory.

Although the language was drafted well over a century ago, the following statements by Justice Cooley in our Supreme Court's decision in *Arnold, supra* at 305-306, remain just as relevant today as they were in 1880:

> It was never doubted that the conduct of a suspected party, when charged with a crime, may be put in evidence against him, when it is such as an innocent man would not be likely to resort to. Thus, it may be shown that he made false statements for the purpose of misleading or warding off suspicion. Though these are by no means conclusive of guilt, they may strengthen the inferences arising from other facts. So it may be shown that the accused fled to escape

arrest, or broke jail, or attempted to do so, or offered a bribe for his liberty to his keeper. These are familiar cases and rest in sound reason. But the case of deliberate fabrication of evidence, or of attempt in that direction, would seem to be still plainer . . . .

\* \* \*

In [one case], anonymous letters written by defendant to mislead the officers were received as bearing upon his guilt. All these attempts to avoid a trial, to evade conviction by frauds upon the law, or to lead suspicion and investigation in some other direction by false or covert suggestions or insinuations, are so unlike the conduct of innocent men that they are justly regarded as giving some evidence of a consciousness of guilt. They do not prove it, but the jury are entitled to consider and weigh them in connection with the more direct evidence. [Citations omitted.]

We hold that attempting to create a false defense is evidence of a guilty conscience just as fleeing the jurisdiction to avoid arrest or procuring false witnesses to avoid conviction is evidence of a guilty conscience. Defendant fabricated evidence in a failed effort to mislead the police. An innocent man would not likely resort to suggesting to law enforcement officials that someone set fire to his home because he filed a lawsuit and then stage the shooting of his vehicle to make it appear as though this defense were true. We note that, had police not been able to connect the shooting of the car to a gun owned by defendant, defendant would most certainly have demanded admission of the evidence to deflect guilt away from him and toward an unknown perpetrator.

Additionally, the admission of the car shooting incident did not unfairly prejudice defendant. In *McGhee, supra* at 613-614, this Court observed:

The third criterion is whether the danger of undue prejudice from the other-acts evidence substantially outweighed its probative value. All relevant evidence is prejudicial; it is only unfairly prejudicial evidence that should be excluded. Unfair prejudice exists when there is a tendency that evidence with little probative value will be given too much weight by the jury. This unfair prejudice refers to the tendency of the proposed evidence to adversely affect the objecting party's position by injecting considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock. [Citations and internal quotation marks omitted.]

Here, the challenged evidence was highly probative of defendant's identity as the perpetrator. It tended to show that defendant burned his house, as opposed to someone else, by proving his state of mind – consciousness of guilt. The other-acts

evidence did not inject considerations extraneous to the merits of the case. There was no error in admitting the evidence.

(MCOA Op. 1-3) (footnote omitted.)

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

The admission of evidence that Petitioner shot his car clearly did not deprive Petitioner of a fundamentally fair trial. As thoroughly discussed by the Michigan Court of Appeals, Petitioner's attempt to manufacture evidence in support of his defense theory was evidence of a guilty conscience. Petitioner made statements throughout the investigation suggesting that members or former members of the Lake Odessa Police Department set his house on fire in retaliation for a lawsuit that Petitioner filed against the department. Petitioner alleged that he had been the victim of ten or more tire slashings in Lake Odessa, and suggested that the car shooting was a further act

of retaliation by the same individuals. An innocent person would not resort to shooting his car in an effort to mislead the police regarding the perpetrator of a crime. Moreover, despite Petitioner's assertion to the contrary, the evidence also refuted the defense theory that the fire was set by individuals with a vedetta against Petitioner. The trial court also gave the jury a limiting instruction regarding the evidence, which reduced the risk of unfair prejudice. (Tr. VIII, 160-62.)

Furthermore, habeas relief can be granted only when the state court's decision is in conflict with clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n.5. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512; *accord*, *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007). Consequently, there is no "clearly established federal law" to which the state court's decision to allow this evidence could be "contrary" within the meaning of section 2254(d)(1). *Id.* at 513. Therefore, the Court must deny relief on this claim.

II.        **Prosecutorial Misconduct**

In his third ground for habeas corpus relief, Petitioner contends that the prosecutor committed reversible error during closing argument when she made comments that shifted the burden of proof and violated his Fifth Amendment right to remain silent.

Petitioner's claim concerns the following portion of the prosecutor's closing argument:

> The last thing I want to say is, you know, he keeps trying to minimize this shooting. I'm not even addressing that. The shooting is relevant. you know, because it's a cover-up. They're trying to point the finger at somebody else. People are out to get him. Even he makes it relevant. He says it's relevant. When the defendant is arrested, you know what he says.
>
> He's hiding in the woods with a hoodie over his head, right? He tries to claim that he's hiding from these people that are out to get him, because he tells the officer, Randy Keift, he says, "Oh, yeah. Well, I noticed you guys. My vehicle has been shot recently" right? That's what he says. He's -- he's making it relevant. He knows it's relevant. He created the whole thing, right?
>
> He gets arrested, and he tries to use that to explain why he was hiding in the woods from the police if he's he's not guilty of anything? This is someone who shot up a vehicle recently. He makes it relevant. He's trying to tell you that these things are linked. The fire is linked. They are out to get me. The tire slashings you can't document. Someone is out to get me. The car shooting, someone's out to get me. Evidence of that. He makes it relevant. He says it is. He says, "that's why I'm hiding. It's not because of the fire, not because of you guys. **But, then he doesn't give you the courtesy, the decency of coming up here and explaining why this happened. Why it didn't happen. Dispute it. Prove it didn't happen. Prove it wasn't him**.

(Tr. VIII, 136-37) (emphasis added.)[7]

The Michigan Court of Appeals found that the prosecutor's comments were improper, but concluded that they did not deprive him of a fair trial. The court stated:

---

[7]Defense counsel objected to the prosecutor's argument, but the objection was overruled by the trial court. (Tr. VIII, 137.)

Finally, defendant argues that the prosecution committed misconduct requiring reversal by making improper comments about the burden of proof and defendant's Fifth Amendment right not to testify. We review preserved claims of prosecutorial misconduct de novo, *People v Pfaffle*, 246 Mich App 282, 288; 632 NW2d 162 (2001), to determine whether a defendant received a fair and impartial trial, *People v Cox*, 268 Mich App 440, 450-451; 709 NW2d 152 (2005). The defendant receives a fair and impartial trial so long as the misconduct did not result in prejudice. *People v Abraham*, 256 Mich App 265, 272; 662 NW2d 836 (2003).

We have reviewed the challenged remarks and are particularly troubled by the following comments made by the prosecutor:

> He [defendant] gets arrested . . . . [He says] [s]omeone is out to get me. . . . But, then he doesn't give you the courtesy, the decency of coming up here and explaining why this happened. Why it didn't happen. Dispute it. Prove it didn't happen. Prove it wasn't him.

To effectuate a defendant's Fifth Amendment right not to testify, "no reference or comment may be made regarding [the] defendant's failure to testify." *People v Fields*, 450 Mich 94, 108-109; 538 NW2d 356 (1995), citing *Griffin v California*, 380 US 609; 85 S Ct 1229; 14 L Ed 2d 106 (1965); MCL 600.2159 ("A defendant in any criminal case or proceeding shall only at his own request be deemed a competent witness, and his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect."). When the prosecutor in the case at bar referred to defendant not having the decency or courtesy "of coming up here," it was clearly a reference to defendant's failure to take the stand, and this inappropriate remark was followed up by commentary lambasting defendant for not proving or disproving his position. The remarks were entirely improper.

Despite our dismay with the prosecutor, we are not prepared to hold that the offensive comments warrant reversal. The trial court instructed the jury to decide the case based only on the law and on all the evidence presented. *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008) (jurors are presumed to follow their instructions). The trial court further explained that the lawyers' statements are not evidence. In addition, the trial court instructed the jury to presume defendant innocent until proven guilty beyond a reasonable doubt and not to use defendant's choice not to testify against him. Moreover, there was strong evidence of guilt. In sum, taking into consideration the entire record, we conclude that defendant received a fair and impartial trial, as he was not prejudiced by the improper remarks.

(MCOA Op., 4.)

We begin with the principle that there is nothing impermissible about a prosecutor's commenting on the defendant's failure to rebut evidence, so long as he does not violate the defendant's Fifth Amendment rights by commenting implicitly or explicitly on the defendant's failure to testify. *See Moore v. Mitchell*, 708 F.3d 760, 806 (6th Cir. 2013) (citing *United States v. Clark*, 982 F.2d 965, 968–69 (6th Cir. 1993)). However, "[It] is a familiar and well established rule of law that a prosecutor's direct reference to a defendant's decision not to testify at trial is a violation of that defendant's Fifth Amendment privilege against compelled self-incrimination." *United States v. Wells*, 623 F.3d 332, 338 (6th Cir. 2010) (citing *Griffin v. California*, 380 U.S. 609, 610–15 (1965)). Moreover, while no error results from pointing out that the defense theory lacks evidentiary support, *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005), it is improper for the prosecutor to suggest that the defendant has the burden of proof or any obligation to produce evidence to prove his innocence. *Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 332 (6th Cir. 2012).

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Sixth Circuit has adapted its four-factor inquiry into the flagrancy of a prosecutor's improper remarks to address more specifically a prosecutor's indirect comment on the right to silence. This Court must ask: "(1) [w]ere the comments manifestly intended to reflect on the accused's silence or of such a character that the jury would naturally and necessarily take them as such; (2) were the remarks isolated or extensive; (3) was the evidence of guilt otherwise

overwhelming; [and] (4) what curative instructions were given and when." *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003) (internal quotation marks and citations omitted).

In this case, the prosecutor's comment that Petitioner did not have "the decency of coming up here and explaining why this happened," was aimed at Petitioner's failure to rebut the evidence presented by the prosecution, but manifestly reflected on Petitioner's failure to testify at trial. *See Griffin*, 380 U.S. at 611 (finding improper a prosecutor's comments that, "[The defendant] has not seen fit to take the stand and deny or explain . . . . Essie Mae is dead, she can't tell you her side of the story. The defendant won't."). In addition, the prosecutor's statement that Petitioner failed to "Prove it didn't happen. Prove it wasn't him," explicitly shifted the burden of proof to the defense. While the prosecutor's comments were isolated and not particularly extensive, I agree with Michigan Court of Appeals that they were certainly improper.

Petitioner, however, cannot establish that the prosecutor's comments denied him a fair trial in light of the overwhelming evidence of his guilt. There was no dispute that the fire at Petitioner's home was arson. Thus, the trial focused on whether Petitioner was responsible for setting the fire. The prosecutor presented compelling evidence that Petitioner was motivated to burn down his house and collect the insurance proceeds so that he could purchase a lakefront home and win back his estranged girlfriend. Petitioner had dated Lelea off and on for seven years and they had broken up again six or seven weeks before the fire. (Tr. V, 13.) Before their most recent breakup, Petitioner and Lelea had started looking at lakefront homes, but Petitioner had to sell his home before he could purchase another. (Tr. IV, 128, 178-187.) At the time of the fire, Petitioner's house had been on the market for five months with little to no interest from potential buyers. (Tr. IV, 180-87.) The prosecutor's expert testified that, under the homeowner's insurance policy, Petitioner potentially could walk away with significantly more cash after the fire than if he had sold

the house at the list price.  (Tr. VII, 149-55.)  Petitioner and Lelea reunited on the night of the fire

and were married three weeks later.  (Tr. V, 15-17; Tr. VIII, 44-49.)  The profit motive for the fire

was further evidenced by Petitioner's admitted removal from the house of framed family photos and

photos of Lelea in advance of the fire.  (Tr. III, 104-113; Tr. IV, 121, 143-48, 154-55; Tr. V, 25-28;

Tr. VIII, 8-9, 29-30.)

        The prosecutor also presented evidence showing that Petitioner had the opportunity

to set the fire before he left for Kosciuszko Hall.  Petitioner's neighbor, William Bokhout, saw some

haze and smelled fire when he arrived home at 6:00 p.m.  When he left home at 6:30 p.m., Bokhout

drove up to Petitioner's house and observed flames in the living room.  (Tr. II, 109-114.)  During

his examination under oath, Petitioner indicated that he left home around 6:00 p.m. and arrived at

Kosciuszko Hall at 6:30 or 7:00 p.m.  (Tr. V, 30.)  According to Petitioner, it took fifteen to thirty

minutes to get from his house to the hall.  (Tr. V, 38.)  Petitioner's direct connect calls to Eva Cole

at 4:48 p.m. and 5:51 p.m. connected through the cell phone tower closest to his residence.  (Tr. VI,

90.)  The calls Petitioner made to Anthony Beurkens at 6:52 p.m. and 6:56 p.m. were connected

through the cell phone towers at Ballpark Drive and Brigg's Park, which were on the way to

Kosciuszko Hall.  (Tr. VI, 15, 90-91; Tr. VII, 12-13.)  Consequently, there was ample evidence

Petitioner could have set the blaze before he left home and arrived at the hall.

        The prosecution offered additional circumstantial evidence that supported a finding

of guilt, including convincing evidence that Petitioner lied to police about checking his voice mail

messages on the night of the fire.  Cell phone records showed that Chief Peterson left a voice

message for Petitioner at 8:13 p.m.  (Tr. VII, 16.)  Royce Rodgers left a second message for

Petitioner about the fire at 9:34 p.m.  (Tr. II, 144-46; Tr. VII, 16.)  Petitioner claimed that he did not

discover the messages on his cell phone until around 10:00 p.m., after he and Cole returned from

getting food.  (Tr. IV, 115-16; Tr. V, 32; Tr. VII, 17.)  However, according to Petitioner's cell phone records, he checked his voice mail at 5:56 p.m., 8:20 p.m. and 9:52 p.m.  (Tr. V, 32-33; Tr. VI, 19-20; Tr. VII, 16).  Petitioner did not return the call to Chief Peterson until 10:35 p.m. (Tr. VI, 15-16.)

The prosecution also presented evidence that the fire alarms in the house had been disabled.  Petitioner had three battery-powered smoke detectors and one hard-wired detector in the house.  (Tr. V, 34.)  The firefighters who responded to the fire did not hear any fire alarms sounding when they entered the house.  (Tr. II, 158; Tr. V, 82.)  There was no battery in the detector found on the living room floor and the battery had been disconnected from the detector in the basement.  (Tr. V, 85, 92-94, 132.)  The third battery-powered detector was melted into the carpet in the stairwell.  (Tr. V, 85.)  Police officers found one nine-volt battery on the living room floor and two more in the kitchen garbage.  (Tr. V, 81-82.)  Petitioner admitted to removing the battery from one of the detectors a week before the fire because it was beeping and needed a new battery.  (Tr. V, 34.)  The batteries found in the house were tested and found to have sufficient voltage to power a smoke detector.  (Tr. VI, 40-46.)  In addition, the unmarked circuit breaker for the hard-wired alarm had been tripped or switched off.  (Tr. VI, 34-36; Tr. VII, 21-26.)

In addition, as discussed above, Petitioner's defense, implied or otherwise, was that the arson was committed by current or former members of the Lake Odessa Police Department who had a vendetta against him for filing a lawsuit in connection with his previous employment at the department (Tr. IV, 117-19.), but there was no evidence on the record supporting Petitioner's defense theory.  Petitioner made statements that he had been the victim of eight to ten tire slashings, but there were no police reports or other evidence to support that assertion.  (Tr. IV, 118, 133; Tr. VII, 65-67.)  Petitioner's defense theory was further undermined by evidence that Petitioner shot his own car in an attempt to manufacture evidence in support of his defense theory.  The bullet

recovered from the car matched a handgun owned by Petitioner, which was found hidden in a bucket of sand in Petitioner's garage. (Tr. V, 149, 170-180; Tr. VI, 112-21; Tr. VII, 47-51.) Also significant was Petitioner's attempt to hide from police in the woods behind his home when they came to arrest him. (Tr. V, 156-61.)

  The prosecutor's improper comments also were mitigated by the trial court's final instructions, which were given shortly after closing arguments. The court instructed the jury that Petitioner was presumed innocent until proven guilty beyond a reasonable doubt. (Tr. VIII, 140-43.) The court explained that reasonable doubt is not a "mere possibility" of guilt, but "a firm conviction after careful consideration" that the defendant is guilty of the offense. (Tr. VIII, 143.) With regard to his right to remain silent. The court stated:

> You've been told and it's absolutely true that every defendant has a right not to testify. And, if a defendant chooses not to do that, you don't hold it against him. You don't draw conclusions against the individual because he or she didn't testify.

> That doesn't extend to saying that you ignore the evidence and the other things he did choose to present. But, he has a right not to, himself, testify, and by all means, you are not to use that against him.

(Tr. VIII, 159.) The trial court also instructed the jury to decide the case based only on the law and evidence presented at trial, and that the lawyers statements are not evidence. (Tr. VIII, 149-50.) This Court may presume that the jury followed the trial court's instructions, and Petitioner has offered nothing to rebut this presumption. *See United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011); *Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir. 2005).

  In light of the strong evidence against Petitioner and the trial court's curative instructions given in close proximity to the error, I cannot find that the decision of the Michigan Court of Appeals was an unreasonable application of clearly established Supreme Court precedent.

III.     **Jury Instructions**

In Ground II, Petitioner contends that he was denied a fair trial as a result of various instructional errors made by the trial court.  Specifically, Petitioner asserts that the trial court failed to properly instruct the jury on Petitioner's right not to testify, the other bad acts evidence, the burden of proof and the definition of reasonable doubt.

The Michigan Court of Appeals rejected Petitioner's claim of instructional error, stating:

> Next, defendant argues that the trial court's instructions to the jury were erroneous and deprived him of a fair trial. This Court reviews claims of instructional error de novo. *People v Kurr*, 253 Mich App 317, 327; 654 NW2d 651 (2002). We must read jury instructions as a whole rather than extracted piecemeal to determine error, and even if the instructions are somewhat imperfect, "instructions do not warrant reversal if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *Id.* Defendant's instructional challenges could easily have been avoided by use of the standard criminal jury instructions; however, that being said, we find no basis warranting reversal. We have examined each one of the instructions challenged by defendant and find that the trial court's self-styled instructions were sufficiently accurate in conveying the relevant legal principles to the jury and that, to the extent that they were somewhat imperfect and deviated from the standard instructions, the instructions still fairly presented the issues to be tried and protected defendant's rights.  Reading the instructions as a whole, defendant was not deprived of a fair trial.

(MCOA Op., 3-4.)

Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review.  To warrant federal habeas relief as a result of an incorrect jury instruction, a petitioner must show more than that the instruction was "undesirable, erroneous, or even 'universally condemned,' but that it violated [some constitutional right]." *Estelle*, 502 U.S. at 72 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Estelle*, 502 U.S. at 75 (erroneous jury

instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Rashad v. Lafler*, 675 F.3d 564, 569 (6th Cir. 2012) (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

      Petitioner has not met this burden of establishing a due process violation arising from the trial court's instructions. The court has reviewed the trial court's instructions concerning Petitioner's right not to testify, burden of proof and definition of reasonable doubt in the preceding section and found that they adequately informed the jury of the relevant law. Likewise, the trial court's instructions regarding other bad acts evidence, discussed in Section I, *supra,* did not violate Petitioner's federal rights. Petitioner argues that instead of providing the standard jury instruction requested by the defense,[8] the trial court gave its own version of the instruction. The court stated:

> You also heard evidence here of one other episode, at least one in Muskegon, of alleged criminal behavior on his part. You have to use that carefully. If it wasn't

---

[8] The standard jury instruction, CJI2d 4.11 "Evidence of Other Offenses-Relevance Limited to Particular Issue," provides:

(1) You have heard evidence that was introduced to show that the defendant committed [a crime/ crimes/improper acts] for which [he/she] is not on trial.

(2) If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether this evidence tends to show: [Choose one or more from (a) through (g):]
(a) That the defendant had a reason to commit the crime;
(b) That the defendant specifically meant to _____;
(c) That the defendant knew what the things found in [his/her] possession were;
(d) That the defendant acted purposefully -- that is, not by accident or mistake, or because [he/she] misjudged the situation;
(e)That the defendant used a plan, system, or characteristic scheme that [he / she] has used before or since;
(f) Who committed the crime that the defendant is charged with.
(g)[State other proper purpose for which evidence is offered.]

(3) You must not consider this evidence for any other purpose. For example, you must not decide that it shows that the defendant is a bad person or that [he/she] is likely to commit crimes. You must not convict the defendant here because you think [he/she] is guilty of other bad conduct. All the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime, or you must find [him/her] not guilty.

information you could use in a legitimate way, it wouldn't have been presented to you.  But, you have to be careful you don't overuse it.

It may be used by you for whatever it reveals about what was going on in this case.  Whatever, if anything, you conclude it says about this particular matter, in one way or another, beforehand, in reaction afterwards, or whatever, is legitimate.  The one thing you can't do, however, is simply take the easy way out as a theme of my instructions and say, "Oh, well, we find he did that other thing in Muskegon, and that was criminal; therefore, he must have done this."  No.  It doesn't work that way.  You can't say the person is guilty of one crime because you're satisfied they committed another one.

If, however, there's something about the way that other crime was committed, or the circumstances under which it was committed, or the way it fits into here, that helps explain the case, if that explanation is a legitimate thing for you to use, or that consideration is legitimate for you, use it.   You may also consider any efforts on the part of any defendant -- this applies in every criminal case -- to flee from the police, to hide from the police, to obscure evidence, anything of that sort, because that behavior, common sense tells you, can be indicative of guilt.  You can conclude that the reason a person hid or fled, or hid some evidence, was they knew they had done something wrong, and they didn't want the police to find out about it.  If that's the conclusion you draw, that is a legitimate conclusion.

But, there are other explanations. Sometimes people just do stupid things.  Sometimes people do things that are inexplicable.  And, even if a person is acknowledging their guilt of something, it doesn't always tell us guilt of what.  You may say, "Well, it's obvious he knew he did something wrong, but what was it?"  Now, in a particular case, it may be that the acknowledgment pretty much points to a particular thing.  What I'm saying is, you do this in a discriminating fashion.  And, remember, that nobody can ever be convicted solely on the basis that they hid, they fled, they didn't cooperate with the police, they tried to obscure evidence, or whatever.  It's a factor to consider like everything else.  But, it is not enough, in and of itself, to convict somebody of a crime.

(Tr. VIII, 160-62.) Petitioner argues that the trial court's statement that the jury had heard "evidence here of one other episode, at least one in Muskegon, of alleged criminal behavior on his part," suggested to the jury that Petitioner had engaged in other instances of criminal behavior that the jury had not heard about.  In addition, Petitioner contends that the instruction failed to adequately

articulate the permissible and impermissible uses of the evidence. Petitioner asserts that these deficiencies likely contributed to a finding of guilt.

Michigan trial judges are permitted to modify a standard jury instruction when presented with a clearer or more accurate instruction. *People v. Richardson*, 803 N.W.2d 302, 304 (Mich. 2011). Further, the Michigan Court of Appeals has recognized that a cautionary instruction regarding the limited purposes of other acts evidence may be "carefully crafted" to advise the jurors "that they are to consider the other acts evidence only as indicative of the reasons for which the evidence is proffered." *People v. Martzke*, 651 N.W.2d 490, 498 (Mich. Ct. App. 2002). Here, the trial court attempted to tailor the instructions to the facts presented in this case. Taken in the proper context, the trial court's instructions did not convey, or even suggest, that Petitioner had engaged in more than one other instance of criminal behavior. *See Estelle*, 502 U.S. at 72 ("It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record.") While the trial court's instruction did not specifically list all of the permissible uses of the evidence contained in the standard jury instruction, the instructions made clear that it was for the jury to decide whether to believe the other acts evidence and to evaluate whether that evidence was probative of the various purposes for which it was offered. The jury was instructed it should not convict Petitioner in this case because it believed that he was guilty of the other bad conduct. Taken as a whole, the instructions did not infuse the trial with unfairness as to deny due process of law. *See Estelle*, 502 U.S. at 75. Thus, it cannot be said the decision of the Michigan Court of Appeals was an unreasonable application of clearly established Supreme Court precedent, and therefore Petitioner is not entitled to habeas corpus relief on this point.

**Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition

be denied.


Dated:  February 13, 2014                    /s/ Hugh W. Brenneman, Jr.
                                             HUGH W. BRENNEMAN, JR.
                                             United States Magistrate Judge




**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of
service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and
responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely
objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d
947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).